**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **GANDHI GUTTA,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **04 C 5988** |
| | ) | |
| **STANDARD SELECT TRUST** | ) | |
| **INSURANCE,** | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

In this ERISA case, plaintiff Gandhi Gutta seeks review of the denial of his claim for long term disability benefits under defendant Standard Select Trust Insurance's long-term disability plan. The parties' cross-motions for summary judgment are before the court. In addition, Standard Select seeks to strike a social security disability ruling in Dr. Gutta's favor because it is outside the administrative record. For the following reasons, the court grants the motion to strike. It also finds that Standard Select's denial of benefits was not arbitrary and capricious and that Standard Select is entitled to summary judgment as to its counterclaim. Thus, Dr. Gutta's motion for summary judgment is denied and Standard Select's motion is granted.

## I.      Background

The court begins by noting that regrettably, the parties' fact statements list facts seriatim in what appears to be a largely random order. The court commends the liberal use of point headings in the future, as this practice makes it far easier to accurately summarize all of the material facts and locate facts as necessary. With that said, the following facts are undisputed unless otherwise noted. Dr. Gutta was born on December 15, 1941. He is a medical doctor and

worked as a general laparoscopic surgeon until August 25, 2000. Dr. Gutta had disability insurance pursuant to a group policy underwritten by Standard Insurance.

### A. Standard Select's Policy

Standard Select's group policy contains an allocation of authority provision which provides as follows:

ALLOCATION OF AUTHORITY

Except for those functions which the Group Policy specifically reserves to the Policyowner or Employer, Standard has full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in its administration, interpretation, and application. Standard's authority includes, but is not limited to:

1.  The right to resolve all matters when a review has been requested;

2.  The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;

3.  The right to determine:

    a.  Eligibility for insurance

    b.  Entitlement to benefits;

    c.  Amount of benefits payable;

    d.  Sufficiency and the amount of information we may reasonably require to determine a., b., or c., above.

Subject to the review procedures of the Group Policy any decision Standard makes in the exercise of our authority is conclusive and binding.

Joint Apdx., Ex. A, Group Policy, Amendment 8, p. 2.

The group policy defines "disabled" as follows:

Until LTD Benefits have been paid for 24 months, you are Disabled if, as a result of Sickness, Accidental Bodily Injury, or Pregnancy, you are either:

a. Unable to perform with reasonable continuity the material duties of your own occupation; or

b. Unable to earn more than 80% of your Indexed Predisability Earnings while working in your own occupation.

After LTD Benefits have been paid for 24 months, you are Disabled if, as a result of Sickness, Accidental Bodily Injury, or pregnancy, you are either:

a. Unable to perform with reasonable continuity the material duties of any gainful occupation for which you are reasonably fitted by education, training, and experience; or

b. Unable to earn more than 80% of your Indexed Predisability Earnings while working in your own or any other occupation.

*Id.*, Group Policy at p. 23.

In addition, the group policy contains a provision for "Income Received From Other Sources." It defines "Income Received From Other Sources," in subsection (f), as "[t]he amount you receive or are eligible to receive because of your disability under any group insurance coverage, other than group credit insurance or group mortgage disability insurance[.]"

**B. Dr. Gutta's Vision**

**1. Dr. Weinberg**

Aaron Weinberg, M.D., an ophthalmologist selected by Standard Select, performed an independent medical examination ("IME") of Dr. Gutta on April 8, 2001. In his IME report, Dr. Weinberg opined that he found no pupillary defect, normal peripheral and arteriole retinas, and no evidence of macular degeneration in either eye. He also found that Dr. Gutta had minimal background diabetic retinopathy changes in his right eye, a laser scar in his left eye as a result of treatment for a leaking microaneurysm associated with his diabetic retinopathy, mild cataracts in each eye, and paracentral scotoma (the loss of a small part outside the central field of vision) in

his left eye.  Based on these findings, he stated that "[w]ith 20/20 vision in both eyes, a normal peripheral retina, and visual field there should be no substantial limitations on [Dr. Gutta's] depth perception."

In his report, Dr. Weinberg also noted that "Dr. Gutta does not feel capable of performing surgery due to his scotoma and decreased depth perception.  Certainly, the lack of confidence in his own surgical skills as well as others in the operating room with similar concerns, it may be reasonable for him to stop practicing."  Dr. Weinberg's report also stated that Dr. Gutta was able to drive himself to and from Dr. Weinberg's office.  Ultimately, Dr. Weinberg concluded that "the objective findings on today's examination do not correlate with his [Dr. Gutta's] complaints" and that Dr. Gutta "should have no restrictions on his physical abilities based on the eye findings described above."

### 2.    Dr. Soroco

Dr. F. Soroco, an endocrinologist, completed an Attending Physician's Statement ("APS").  In this statement,  he stated that Dr. Gutta had blind spots in his left eye and that Dr. Gutta's vision would progressively deteriorate and eventually culminate in total blindness.

### 3.    Dr. Raichland

Dr. Raichland, an ophthalmologist, also completed an APS.  In Dr. Raichland's APS, he recommended Dr. Gutta should stop working on August 25, 2000, due to blind spots in his left eye that cause him to be unable to perform laparoscopic surgery.  Dr. Raichland also noted that Dr. Gutta had been diagnosed with drusen and vitreous bodies on March 17, 1997, and that his diabetes contributes to this condition.  In addition, Dr. Raichland stated that Dr. Gutta's diagnoses include macular degeneration in both eyes and retinal artery aneurysm in his left eye.

He opined that these impairments are permanent and that the macular degeneration could lead to blindness. Finally, he indicated that Dr. Gutta's treatment was complicated by his multiple medical problems.

In late 2000, Debbie Sawyer, a nurse, contacted Dr. Raichland to discuss the outcome of Dr. Gutta's laser surgery. Dr. Raichland informed Nurse Sawyer that Dr. Gutta has 20/20 vision with corrective lenses, and that he "could not comment as to whether [his blind spot] would be significant enough to cause [Dr. Gutta] to cease work." Dr. Raichland also told Nurse Sawyer that he thought that Dr. Gutta had ceased work due to his other medical conditions, not due to any problems with his vision. He then suggested that "[Standard Select] might want [Dr. Gutta] evaluated by another ophthalmologist to determine [Dr. Gutta's] limitations."

### B. Dr. Gutta's Orthopedic Condition

#### 1. Dr. Romeo

In January of 2001, Anthony Romeo, M.D., an orthopedic surgeon, recommended right shoulder arthroscopy, capsular release, and limited acromioplasty surgery for Dr. Gutta's shoulder pain. Later that month, he performed right shoulder arthroscopy, acromioplasty, CA-ligament release, and posterior capsular release on Dr. Gutta's right shoulder. Dr. Romeo's preoperative and postoperative diagnosis as of the date of Dr. Gutta's shoulder surgery was right shoulder impingement syndrome and right shoulder posterior capsular stiffness. He reported that Dr. Gutta has a positive impingement sign with some very mild associated bicipital tendonitis on the right side.

On April 6, 2001, Dr. Gutta returned to see Dr. Romeo for a post-operative follow up appointment. Dr. Romeo's notes state:

> Dr. Gutta returns for reevaluation. He is three months following his right shoulder arthroscopy and acromioplasty. He is having no pain at night, and he is able to use his arm for all of his activities. He would like to return back to golf and I have no reservations in allowing him to do so. He will continue with his exercise program on his own. He has had some problems with his right elbow. He has a history of childhood injury to his right elbow. He has occasional mild medial elbow pain, and he is lacking approximately 5 degrees of extension. His radiographs demonstrate an old fibrous nonunion at the medical epicondyle secondary to an MCL strain during his developmental years. This is a nonoperative problem. He will continue to use his arm as tolerated. I will see Dr. Gutta back either in six months or on an as-needed basis. We did briefly discuss his left shoulder, but, at this time, he is having no discomfort and would like to continue with conservative management.

Joint Apdx., Ex. D, Admin. Rec. at STND 0710.

### 2.      Dr. Fancher

On January 27, 2001, Standard consulted with Bradley Fancher, M.D., who opined, based on his review of the medical records, that Dr. Gutta would be unable to perform laparoscopic surgery while recovering from the capsular release, and that his shoulder condition "was likely fairly limiting prior to surgery." *Id*. at STND 0580-582.

### 3.      Dr. Joshi

On October 4, 2000, Dr. Gutta saw N.V. Joshi, M.D., a neurologist, for a neurophysiological consultation. Dr. Gutta complained of pain in deltoid, biceps, and brachioradialis muscle on the right side. Dr. Gutta's H.F. Wave study, which evaluates nerve conduction, showed an absence of 'H' Reflex on his right side. His EMG study was "mildly abnormal" with respect to the firing frequency of the motor units with "no acute denervation," normal sensory study, and normal motor study. Joint Apdx., Ex. D, Admin. Rec. at STND

0443.  Dr. Joshi's final impression was very mild right C6-7 radiculopathy with a notation that "this does not explain the clinical picture."  *Id.*

In Dr. Joshi's APS, he stated that Dr. Gutta's symptoms were weakness of the left arm and hand and his primary diagnosis was "ulnar nerve palsy left" with symptoms of weakness in his left arm and hand.  *Id.* at STND 0402.  He stated that "due to paralysis of left ulnar nerve, patient has problems performing surgery" and opined that "[p]atient cannot perform major surgical procedures."  He then concluded that Dr. Gutta should stop working as a surgeon on August 25, 2000, and added Dr. Gutta will not get better, only worse and that there is no specific treatment possible.  *Id.*  On November 21, 2000, Dr. Gutta advised Standard Select that he is "not following" with Dr. Joshi.  *Id.* at STND 0338.

### 4.     Dr. Gandhi

Dr. Joshi referred Dr. Gutta to Vikram Gandhi, M.D., an orthopedist.  Dr. Gandhi filled out an APS on September 15, 2000.  As of November 21, 2000, Dr. Gutta advised Standard Select that he was "not following" with Dr. Gandhi.  In Dr. Gandhi's APS, he stated that Dr. Gutta's symptoms were pain in the left thumb, an inability to tie knots, and severe pain while wearing gloves.  He also noted that Dr. Gutta had degenerative changes in the carpal bones of both wrists and could not perform surgery due to pain, the inability to wear gloves, ulnar nerve palsy, blind spots in the left eye, and impaired hand function.  Dr. Gandhi thus recommended that Dr. Gutta should stop performing surgery as of August 25, 2000.

Dr. Gandhi further reported that physical therapy and immobilization has not helped Dr. Gutta's pain and that Dr. Gutta cannot take medications or steroid injections for the pain because they cause stomach pain and impair his ability to manage his blood sugar.  Dr. Gandhi opined

that he did not expect Dr. Gutta's condition to change, Dr. Gutta's condition is progressively deteriorating, and Dr. Gutta has multiple non-correctable problems.

### 5. Dr. Soruco

Dr. Luis F. Soruco, M.D., is an endocrinologist who treated Dr. Gutta's diabetes. The record contains progress notes from September of 1995 indicating that Dr. Gutta stated that he was experiencing pain and vision problems. On December 23, 2002, Dr. Soruco noted that Dr. Gutta had Type I diabetes with episodes of mild hypoglycemia and increased blood pressure.

Dr. Soruco prepared an APS which Dr. Gutta submitted to Standard Select. In his APS, which is dated October 4, 2000, Dr. Soruco noted that Dr. Gutta had been diagnosed with diabetes seven years ago. He also recommended that Dr. Gutta should stop working on August 25, 2000, because blind spots and his dislocated left thumb prevent him from performing laparoscopic surgery and tying knots, respectively. In addition, Dr. Soruco noted that these limitations are permanent and cannot be corrected. Finally, in his capacity as an endocrinologist, he opined that Dr. Gutta's vision would progressively deteriorate and that Dr. Gutta would eventually become blind.

### 6. Dr. Kumar

Dr. Surender Kumar, M.D., is a cardiologist. On February 1, 1993, Dr. Kumar reported that Dr. Gutta has a history of diabetes and atypical chest pain. On January 29, 1993, and February 1, 1993, Dr. Gutta underwent a Thallium Treadmill Stress Test. The thallium studies showed reversible ischemia in the anteroseptal and a small portion of the posterolateral wall of the heart. On February 1, 1993, Dr. Gutta underwent cardiac catheterization for exertional chest pain from mild coronary artery disease in the left anterior descending branch.

On May 16, 2000, Dr. Gutta underwent a left heart catheterization, left ventricular and right and left coronary angiography followed by aortic arch angiography due to a history of chest pain. Dr. Kumar's postoperative diagnosis of Dr. Gutta was mild coronary artery disease and a normal left ventricle. Upon discharge, Dr. Kumar noted that Dr. Gutta is taking the following medications: insulin, Vasotec, Lopid, Lipitor, and baby aspirin. Dr. Kumar's records do not contain any opinions as to whether Dr. Gutta's heart problems affect his ability to work.

### 7. Dr. Carlson

Dr. Hans Carlson is a physiatrist (a physician specializing in physical medicine and rehabilitation). Standard asked him to review the available medical records. On July 13, 2004, Dr. Carlson prepared a Physicians Consultant Memo which stated, in pertinent part, that:

> The claimant is noted to have limitations secondary to musculoskeletal conditions and these have been described as hand and wrist pain as well as degenerative changes, bilateral ulnar neuropathies, degenerative arthritis of the knees, cervical spondylosis, and shoulder pain. These records detail some mild left shoulder tendonitis and right shoulder impingement syndrome that, as of 4/6/01, apparently were essentially resolved or not limiting in activities. We have no notes beyond Dr. Romeo's note from 4/6/01 that suggest ongoing shoulder problems. The available notes do not provide any convincing evidence of an active cervical or lumbosacral radiculopathy or any significant impairment related to the radiculopathy.
>
> The claimant is noted to have some hand pain and imaging studies to document bilateral wrist degenerative changes, as well as left thumb degenerative changes. Records do not show any ongoing treatment with respect to the wrist or hand degenerative changes. In fact, with respect to Dr. [Vikram] Gandhi's records, we only have clinic notes from 12/3/02 and 4/9/04. These records do not provide any evidence of degenerative knee arthritis, or any significant limitations in relation to hip arthritis or lumbar spine degenerative abnormalities . . . .
>
> I would anticipate that a 62-year-old individual with degenerative arthritis of the wrists, left thumb, and cervical spondylosis would be capable of performing sedentary to light-level capacity work on a full-time basis. These records do not suggest there is any active or ongoing treatment to correspond to significant

limitations with respect to these conditions.  It would be reasonable that the claimant would be limited from repetitive upper extremity lifting, twisting and manipulating activities with respect to these conditions . . . .

The functional capacity questionnaire filled out by Dr. [Vikram] Gandhi with respect to the available medical documentation available in the chart is more limited than I would anticipate with respect to the claimant's ability to sit, stand, or walk.

*Id*. at STND 1010.

### 8. Dr. Hunton

Dr. Gutta retained Stanley R. Hunton, Ph.D., to prepare a vocational assessment.  In forming his opinion, Dr. Hunton interviewed Dr. Gutta and reviewed Dr. Gutta's curriculum vitae, a December 17, 2003, letter from Dr. Gutta's counsel to Standard Select and a November 11, 2003, interoffice memo from Jeffrey Smith to Anthony Picco of Standard Select which attached medical and income information.  In his assessment, Dr. Hunton opined as follows:

In assessing whether or not Dr. Gutta is qualified to work as a medical director and/or an assistant/associate medical director, I reviewed the qualifications of medical directors identified thorough a Google internet search.  Typically, physicians working as medical directors continue to perform activities in their medical specialties.  They are active in demonstrating a leadership role in their medical community through writing and research as well as having excellent reputations in providing patient care.  Based on a review of Dr. Gutta's curriculum vitae and my interview with him, it is evident that Dr. Gutta was not active in writing or giving presentations . . . . He has been appointed to honorary positions of leadership, but staff surgeons are generally rotated through these positions . . . . The assertion that Dr. Gutta has experience that would transfer to the position of Medical Director and/or Assistant Director is not consistent with Dr. Gutta's work history or the requirements of the positions . . . . It is my opinion based on Dr. Gutta's work experience and age, he does not qualify for the position of Medical Director or Assistant/Associate Medical Director.  Even though he held positions that imply he exercised administrative authority, these have been positions that are rotated among staff doctors and have not been paid positions . . . .

Dr. Gutta does not have the ability to find work that pays 80% of his predisability earnings of $18,335 a month.  Even if he were to be hired as Medical Director, he

- 10 -

would earn much less than 80% of his prior earnings using the data supplied by Jeffery Smith . . . .

Dr. Gutta's capacity to work at any occupation on a sustained basis was assessed based on my interview with him and his medical condition of diabetes . . . . An individual's capacity to work is dependent on the skills and abilities of the individual and also of the determination of the employer if any given individual is best suited for the available positions.  Therefore, it is not possible to assess Dr. Gutta's capacity to work without examining employer attitudes toward hiring persons of Dr. Gutta's age and with chronic disabilities that caused them to leave their chosen professions . . . . In competing with general practitioners for positions such as quality review, his specialized experience does not make him the best candidate.  When a disability reduces a person's labor market to the extent experienced by Dr. Gutta, he needs to be considered totally occupationally disabled.

*Id*. at STND 0982- 0980.

### 9. Charles Dean

Along with Dr. Hunton's report, Dr. Gutta's counsel submitted to Standard an article written by Charles K. Dean, Vocational and Rehabilitation Coordinator of CORE, Inc., entitled "Determinants of Gainful Employability in Long Term Disability," published in the Western Occupational and Environmental Medical Association Spring 2001 Quarterly Newsletter to Standard.  As noted by Standard Select, Mr. Dean's article does not address Dr. Gutta's specific education, training, or experience.

In his article, Mr. Dean writes that:

It is ironic that a high degree of credentialed specialization in one occupation, particularly a unique technical, scientific or medical occupation, tends to lessen skills transferability, hence, employability, while generalization in a broad occupational area tends to expand skills transferability . . . . [I]t would be more difficult to assert gainful employability for a claimant over the age of 60 as opposed to a claimant under the age of 55.

*Id*. at STND 1021-1023.

### 10. Jeffrey Smith

On November 11, 2003, Standard asked its vocational case manager, Jeffrey Smith, to complete an "Any Occupation" review. Jeffrey Smith, in his report, notes that Standard's disability claims specialist, Anthony Picco, "indicated that the considered annual wage for alternative occupations should be $100,000 and above that the claimant's current limitations and restrictions are inability to perform surgery due to left eye blind spots." Joint Apdx., Ex. D, Admin. Rec. at STND 0948.

Jeffrey Smith reviewed Dr. Gutta's resume, which indicated, among other things, that Dr. Gutta was in private practice as a general surgeon/surgical oncologist from 1980 – 2000 with surgical privileges in seven hospitals. Dr. Gutta was also the Chairman of the Department of Surgery at Loretto Hospital from 1989 – 1992, the President of the Medical Staff at Loretto Hospital from July of 1993 – June of 1995, the Medical Director of Loretto Hospital from July, 1993 – 1995, the Chairman of the Department of Surgery at Oak Park/Rush Hospital from April of 2000 – December of 2001, the President Elect of Glen Oaks Hospital from January of 2001 – December of 2002. He also has served as chairman of a quality control committee and a member of a health care committee, physician advocacy committee, physician review committee. As a member of the department of surgery, Dr. Gutta must attend monthly department committee meetings and quarterly medical staff meetings at different hospitals.

Mr. Smith opined that, "[t]he claimant would have, based on his transferable skills and past experience and education the ability to access either the Medical Director or Assistant/Associate Medical Director positions at or above the considered wage." Joint Apdx., Ex. D, Admin. Rec. at STND 0945.

In the summer of 2004, Standard asked Mr. Smith to review Stanley Hunton's letter, the article written by Charles Dean, and a memo from Dr. Carlson. On July 26, 2004, Mr. Smith prepared a second vocational report. In his second vocational report, Mr. Smith opined that:

> Mr. Hunton reports that the claimant does not have the ability to find work that pays 80% of his predisability earnings of $18, 335 per month. I agree with Mr. Hunton. [G]iven the claimant's background it is realistic to expect earnings at a level at least equivalent to the 25% percentile. This would equate to $128,003 per year for an Assistant Medical Director and $158,865 annually for a Medical Director . . . . [M]y opinion remains that the claimant, if capable of working with the limitations and restrictions outlined by Dr. Carlson would have the ability to access the occupations of Medical Director and Assistant/Associate Medical Director.

*Id*. at STND 1029 - 30.

On July 26, 2004, Mr. Smith opined that Dr. Gutta has "approximately ten and a half years of experience in positions requiring some management and administrative abilities." *Id*. at STND 1031. He added that "[a]lthough honorary positions it does not negate the fact that he did gain skills and abilities that would allow him to access the alternative occupations of Medical or Associate/ Assistant Medical Director." *Id*. He agreed that Dr. Gutta does not have the ability to find work that pays 80% of his predisability earnings of $18,335 per month. Nevertheless, Mr. Smith opined that, given Dr. Gutta's vocational background, Dr. Gutta could expect earnings as a Medical Director of $158,865.

In forming these opinions, Mr. Smith stated that he relied on Dr. Gutta's own statement that he had administrative responsibilities as a chairman of the department of surgery and quality improvement and executive committee member. In addition, with regard to Dr. Gutta's physical restrictions, Mr. Smith stated his decision took into account the restrictions provided by Carlson, the factual background reflected in both of Mr. Smith's reports, and Dr. Gutta's entire file,

including the Claimant's Statement in which Dr. Gutta identified his purported medical conditions and his claimed restrictions and limitations. Moreover, the record shows that Mr. Smith was aware of Dr. Gutta's scotoma.

### 11. Dr. Shih

On August 24, 2004, Standard consulted Mark Shih, M.D., a physiatrist. Dr. Shih reviewed Dr. Carlson's Physician Consultant Memo and Dr. Gutta's claim file and then prepared his own Physician Consultant Memo which stated, in pertinent part, that:

> The claimant is a 63-year-old former general surgeon who ceased work on 8/24/00 secondary to aneurysm of the left retinal artery and fovea as well as multiple orthopedic complaints including a left thumb dislocation, degenerative joint disease at the wrist, left rotator cuff injury, right AC joint degenerative joint disease, and cervical degenerative disc disease . . . .
>
> It is my medical opinion that the medical records support the claimant's ability to work full-time in a sedentary to light-level work capacity . . . . Reasonable restrictions would be against frequent to repetitive fingering and handling activities involving the non-dominant left upper extremity. Otherwise, reasonable accommodations would include position changes every 30 to 60 minutes from sitting to standing with an ability to stand and walk on an occasional to frequent basis . . . .
>
> [Dr. Gutta's] primary complaint of visual impairment does not appear to be substantiated to a significant degree as his independent medical examiner had indicated restrictions only in monocular work activities . . . .Otherwise, his main issues of this and some arthritis/dislocation has involved his non-dominant left upper extremity. He, as well, does continue to have issues of arthritis and degenerative disc disease involving the right upper extremity and neck. This, however, will not preclude him from full-time work in a sedentary or light-level work capacity. Reasonable restrictions would be against frequent to repetitive fingering and handling activities involving the non-dominant left upper extremity. Otherwise, reasonable accommodations would include position changes every 30 to 60 minutes from sitting to standing with an ability to stand and walk on an occasional to frequent basis.

Joint Apdx., Ex. D, Admin. Rec. at STND 1059.

## C.     Standard's Denial of Benefits

On August 9, 2004, Standard stated that it had completed its review of Dr. Gutta's appeal from the denial of long-term disability benefits. *See id*. at STND 1080. In making this decision, Standard stated that it relied on the contract language, plan documents, and Dr. Gutta's file. Standard also referenced its prior letters regarding benefits dated December 1, 2003, December 31, 2003, and March 18, 2004.

With respect to the definition of disability, Standard advised Dr. Gutta that subsection (a) ("Unable to perform with reasonable continuity the material duties of any gainful occupation for which you are reasonably fitted by education, training, and experience") was the relevant definition because he was not working. It also rejected Dr. Gutta's position that subsection (b) ("Unable to earn more than 80% of your Indexed Predisability Earnings while working in your own or any other occupation") applied, explaining that subsection (b) only applied when the claimant was in fact working in his own or any other occupation.

Standard Select then stated that its responsibility was to identify occupations Dr. Gutta was capable of performing "with respect to his limitations, and restrictions and education, training and experience." *Id*. "[T]hat evaluation was not limited to positions that required surgical or clinical medical practice or limited in respect to salaries to what he earned while working in those positions prior to his disability." *Id*.

Standard noted that:

> Dr. Gutta ceased work on August 25, 2000, due to multiple medical conditions. He reported diagnoses of diabetes type I; macular degeneration; retina artery aneurism in the left eye with a reported residual blind spot following surgical repair; dislocation of left thumb; degenerative arthritis of the wrist, bilateral; ulnar palsy of the left arm and hand with weakness; rotator cuff injury, left shoulder; and degenerative arthritis is the AC joint, right. The records also indicated that

Dr. Gutta is status post right shoulder arthroscopy, with debridement, and acromioplasty and capsular release on January 11, 2001. Although he provided multiple medical diagnoses, Dr. Gutta's LTD claim was approved due to his inability to perform the material duties of his occupation of physician/surgeon given his vision complaints.

*Id*. at STND 1079.

Standard then noted that Dr. Raichland's assessment of Dr. Gutta's vision indicated that he could not work as a surgeon but "never offered with substantiation that Dr. Gutta's vision complaints preclude him from performing other occupational activities." *Id*.

It also stated that Dr. Ghandi had seen Dr. Gutta for musculoskeletal complaints. Dr. Gutta's primary diagnosis was a dislocated left thumb, with a secondary diagnosis of aneurysm left retinal artery. Dr. Gutta "had problems with degenerative changes [to] both wrists and carpal bones, and an ulnar nerve palsy. Due to pain, [Dr. Gutta] was unable to perform major surgical procedures secondary to his multiple non-correctable problems." *Id*. Dr. Ghandi's notes from April 9, 2004, list "diagnoses of cervical spondylosis, carpometacarpal joint degenerative changes bilaterally, bilateral ulnar neuropathy, and bilateral degenerative joint disease in the knees." A handwritten physical residual functional capacity questionnaire apparently completed by Dr. Ghandi (the form has a duplicate page one with a different handwriting) on April 9th reports that Dr. Gutta can sit for fifteen minutes at a time, stand for ten minutes at a time, stand or walk for approximately two hours, occasionally lift ten pounds, rarely lift up to twenty pounds, and has limited head and neck range of motion. Dr. Ghandi stated that Dr. Gutta had received treatment every few months for 3 ½ years and that he "is considerably in pain." Despite the reported frequency of treatment, the record contains one other chart note from Dr. Ghandi dated December 3, 2002, stating that Dr. Gutta complained of left hand and hip pain

and ordering X-rays. The hand X-rays, taken on January 16, 2003, show degenerative changes of the metacarpal phalangeal joint of the thumb without fracture or dislocation. In turn, the hip X-rays showed minimal degenerative changes. *Id.*

Standard then summarized Dr. Soruco's APS and noted that Dr. Soruco's most recent chart note dated December 23, 2002, reported that Dr. Gutta had a history of Type I diabetes for ten years and was "feeling okay with only a couple of occasional episodes of hyperglycemia." *Id.* at 1078. His vision was stable, he did not have any problems with his feet, and he had no chest pain, shortness of breath, or GI symptoms. Standard also noted that Dr. Soruco never "offered with appropriate substantiation that Dr. Gutta's diabetes prevented him from performing other occupational activities." *Id.*

Next, Standard Select noted Dr. Gutta's visit in October of 2000 to Dr. Raj, who "documented a relatively normal neurologic examination with some decreased sensation of the right upper extremity." *Id.* Standard then summarized Dr. Gutta's MRI and CT reports as well as neurologic assessments. It also stated that it had forwarded Dr. Gutta's file to a "Physician Consultant" (who the court gathers was Dr. Shih) and recapped Dr. Shih's conclusions (in a nutshell, that Dr. Gutta was capable of performing full time sedentary to light level work with no repetitive upper extremity lifting, twisting, or manipulative activities). *Id.* at 1078-79.

In addition, Standard Select considered Mr. Smith's assessment of Dr. Gutta's vocational abilities and Mr. Smith's reaction to Dr. Hunton's opinion. Mr. Smith noted that Dr. Hunton had opined that Dr. Gutta was not qualified for the position of medical director or assistant medical director and that Dr. Gutta lacked the patience necessary to build consensus, as required by administrative positions. Dr. Hunton also believed that because Dr. Gutta's past

administrative positions were rotated among staff doctors and were not paid positions, Dr. Gutta was not a good candidate for an administrative position. However, as noted by Dr. Hunton, Dr. Gutta did apply unsuccessfully for administrative positions with a VA hospital and the Bureau of Prisons.

Mr. Smith disagreed with Dr. Hunton, noting that Dr. Gutta had 10½ years of experience in administrative positions and owned and operated a medical practice for over 20 years. He also referred to Dr. Gutta's Employee Statement which Dr. Gutta submitted to Standard Select and which stated, "I have responsibility to perform administrative job as a chairman of the department of surgery (Honorary) and chairman of the department quality improvement, member of executive committees at three different hospitals, member of cancer committees, and member of quality control committee (non paid job)." *Id*. at 1076.

Mr. Smith then observed that although Dr. Gutta's prior administrative positions were unpaid, that did not mean that he lacked the skills necessary to access these positions. Moreover, while in these positions, he broadened his skills and abilities which would assist him in transitioning to the positions identified by Standard Select. In addition, while Dr. Gutta did not take continuing education classes, he served in various administrative and advisory capacities and thus had ongoing visibility and leadership in the medical community. In addition, Dr. Gutta applied for a number of administrative positions and became licensed in three additional jurisdictions since his date of disability, suggesting that he believed he could perform in some capacity in the medical profession. Finally, in determining that the positions of Medical Director or Assistant Medical Director were appropriate, Mr. Smith referred to the Warren Surveys, which establish that a medical director must have a M.D. degree and extensive knowledge of the

managed care system, reimbursement methods, and treatment protocols and may report to executive officers.

With respect to the Dean article, Mr. Smith observed that Mr. Dean's position is that persons such as Dr. Gutta "lack transferrable skills due to the high degree of credentialed specialization in their occupation." *Id*. at 1075. Transferrable skills can be divided into directly and generally transferrable skills. "'Directly transferrable skills' closely correlate with a claimant's former occupational activities, skills, interests and attitudes" while "'[g]enerally transferrable skills' are less specific characteristics which, although not previously utilized to a great degree, still exist." *Id*.

Standard Select then highlighted Mr. Smith's opinion that these distinctions "only strengthen the fact that transferrable skills are not paramount when one is accessing a job in which there is established job experience." According to Mr. Smith, because Dr. Gutta had "an approximately 20 year history of managerial/ownership experience and a 10½ year history of working in administrative type roles . . . . [h]is overall record has demonstrated to a significant degree the ability to perform in managerial or administrative type positions like a Medical Director or Assistant/Associative Medical Director." *Id*. Mr. Smith also opined that the restrictions and limitations outlined by Dr. Shih were consistent with the positions of Medical Director or Assistant/Associative Medical Director.

In addition, Standard Select stressed that it was evaluating whether Dr. Gutta "could perform with reasonable continuity the material duties of any gainful occupation for which he is reasonably fitted by education, training, or experience. Actual positions available in any specific

job market, how an insured presents himself or how he could be viewed by an employer is [sic] beyond the scope of our evaluation." *Id.* It then concluded:

> We do not find that Dr. Gutta lacks the essential skills required to access these positions [Medical Director or Assistant/Associative Medical Director] in the general economy. We also do not find support that his limited experience with computer systems would preclude him from performing the material duties of these occupations. Lastly, we find no reason to respond to your assertion that Dr. Gutta's age would be used against him or preclude him from accessing any job market in which he chooses to enter as age discrimination in the workplace is prohibited.

> Based on our review of the available records, we continue to believe that Dr. Gutta would have difficulties performing with reasonable continuity the material duties of a physician working as a surgeon. Furthermore, we acknowledge that he has residual limitations from various medical conditions outlined above that are longstanding but stable. Nevertheless, the records do not substantiate that as a result of his overall medical conditions, he is unable to perform occupational duties on a full time basis in other medical fields or capacities considered sedentary or light strength work. The identified occupations of Medical Director or Assistant/Associative Medical Director were reasonable and justified under the provision of the Ghandi Gutta LTD plan. Our determination to close Dr. Gutta's LTD claim based on the Definition of Disability after 24 months of benefits was appropriate and will stand.

*Id.* at 1075-76.

## II.    Discussion

Before the court can reach the merits, it must resolve two threshold issues: (1) whether the de novo or arbitrary and capricious standard of review applies; and (2) whether the court can consider a determination by the Social Security Administration ("SSA") that Dr. Gutta was completely disabled that was issued after the conclusion of Dr. Gutta's administrative appeals before Standard Select. Once the court resolves these issues, it will review Standard Select's denial of benefits and consider whether Standard Select is entitled to recover disability benefits it paid to Dr. Gutta due to his receipt of disability benefits from another insurance company.

## A.    Standard of Review

Dr. Gutta's Rule 56 statement attaches a copy of a notice of award letter from the Social Security Administration which Dr. Gutta obtained after he exhausted his administrative remedies with Standard Select.  In response, Standard Select seeks to strike the letter, contending that the letter was not before it when it considered Dr. Gutta's disability claim.

The admissibility of evidence outside the administrative record turns on the degree of discretion that the plan gives the plan administrator, as an arbitrary and capricious standard of review applies to a discretionary decision by a plan administrator.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989) (courts must apply a de novo standard of review to a plan administrator's denial of benefits unless the plan's plain language gives the administrator discretionary authority to determine eligibility, in which case the deferential arbitrary and capricious standard applies).  If the arbitrary and capricious standard applies, this court can only consider matters within the administrative record.  *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 n.1 (7th Cir. 1996) (when a plan gives its administrator discretion, "[t]he only relevant materials at the time [a district court resolves a motion for summary judgment are] the materials that were before the [plan administrator] when it reached its decision").

The court previously found that the arbitrary and capricious standard applies.  Dr. Gutta seeks reconsideration of this determination in light of *Diaz v. Prudential Ins. Co. of America*, 424 F.3d 635 (7th Cir. 2005), which issued after this court held that the arbitrary and capricious standard was the proper standard of review.  In *Diaz*, the Seventh Circuit noted that in determining which standard of review is appropriate, "the critical question is whether the plan

gives the employee adequate notice that the plan administrator is to make a judgment within the confines of pre-set standards, or if it has the latitude to shape the application, interpretation, and content of the rules in each case." *Diaz v. Prudential Ins. Co. of America*, 424 F.3d at 639-40.

Thus, a plan's denial of benefits must be reviewed de novo unless the plan's language "mimics or is functionally equivalent to the 'safe harbor' language we have suggested: 'Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them.'" *Id*. at 637. The safe harbor language, however, is not mandatory, so any language indicating "that a discretionary determination is envisioned" is enough to insulate the plan's decision from de novo review. *Id*. at 637-38.

Here, Standard Select's plan provides that:

ALLOCATION OF AUTHORITY

Except for those functions which the Group Policy specifically reserves to the Policyowner or Employer, Standard has full and exclusive authority to control and manage the Group Policy, to administer claims, and to interpret the Group Policy and resolve all questions arising in its administration, interpretation, and application. Standard's authority includes, but is not limited to:

1.      The right to resolve all matters when a review has been requested;

2.      The right to establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;

3.      The right to determine:
    a.      Eligibility for insurance
    b.      Entitlement of insurance
    c.      Amount of benefits payable
    d.      Sufficiency and the amount of information that we may reasonably require to determine a., b., or c. above.

Subject to the review procedure of the Group Policy, any decision Standard makes in the exercise of our authority is conclusive and binding.

The court finds that the plan language conveys the idea that Standard Select has discretionary authority to determine eligibility for benefits. Specifically, the plan gives Standard "full and exclusive authority . . . to administer claims, and to interpret the Group Policy and resolve all questions arising in its administration, interpretation, and application." This authority "includes, but is not limited to "[t]he right to resolve all matters when a review has been requested" and "[t]he right to determine . . . [the a]mount of benefits payable." Thus, the plan's language goes well beyond merely giving the plan the power to make decisions.

It is true that the plan does not use the word "discretionary." However, "there are no 'magic words' determining the scope of judicial review of decisions to deny benefits." *Herzberger v. Standard Insurance Co.*, 205 F.3d 327, 331 (7th Cir. 2000). Instead, the court must determine whether the plan language gives employees adequate notice that the plan administrator "has the latitude to shape the application, interpretation, and the content of the rules in each case." *Diaz v. Prudential*, 424 F.3d at 637-39. Standard Select's plan language does this because the full and exclusive ability to resolve any questions regarding the plan's administration, interpretation, and application when administering benefits is another way of saying that the plan administrator has discretion. Accordingly, the court finds that Standard Select's plan places employees on notice that the plan administrator has powers far above and beyond the mere ability to "make judgments within the confines of preset standards." *Id.* at 639.

The court acknowledges that two district courts in California faced with the identical policy language have reached the opposite conclusion. *See Reilly v. Standard Ins. Co.*, No. C 03-05423 THE, 2004 WL 2002434 (N.D. Cal. Sept. 8, 2004); *Bode v. St. Joseph's Health Systems*, 298 F. Supp. 2d 918 (C.D. Cal. 2003). In *Reilly*, the court held that:

> [T]he relevant language in the section of the Policy entitled "Allocation of Authority" does not expressly give Standard discretionary authority in making benefit eligibility determinations – indeed, the word "discretion" is never even used. Rather, the language only allocates to Standard the full and exclusive authority to administer claims, including the right to determine entitlement to benefits and the amount of information it may reasonably require to determine entitlement to benefits. As the Ninth Circuit has squarely held, however, "[a]n allocation of decision-making authority is not, without more, a grant of discretionary authority in making those decisions.

*Id*. at \*2 (internal citations omitted).

In turn, in *Bode*, the court held that the sentence in the policy giving Standard Select "full and exclusive authority to control and manage the group policy, to administer claims, and to interpret the group policy" did not give discretionary authority to Standard Select, reasoning that:

> Under Ninth Circuit law, a plan will not sufficiently confer discretion sufficient to invoke review for abuse of discretion just because it includes a discretionary element. Rather, the power to apply that element must also be unambiguously retained by the administrator. An allocation of decision-making authority is not a grant of discretionary authority.
>
> The plan language here is a grant of decision-making authority, not discretionary authority. The language authorizes Standard to decide claims. It does not contain an express and unambiguous delegation of discretion to Standard to use in reaching those decisions. Simply because an administrator has the authority to make a decision does not mean it retains absolute discretion in making that decision . . . . Under the Ninth Circuit's . . . [standards], the delegation of discretionary authority must be express and unambiguous. It is not difficult to write, "The plan administrator has discretionary authority to grant or deny benefits under this plan."

*Id*. at 920-21 (internal citations and quotations omitted).

The California court's decisions in *Reilly* and *Bode* are not persuasive because they are based on Ninth Circuit precedent which is diametrically opposed to the Seventh Circuit cases which are binding on this court. Specifically, at the risk of being repetitive, courts in the Ninth

Circuit look for the magic word "discretion" when determining if a plan clearly gives discretionary authority to the plan administrator. *Reilly v. Standard Ins. Co.*, 2004 WL 2002434 at *2 ("the relevant language in the section of the Policy entitled "Allocation of Authority" does not expressly give Standard discretionary authority in making benefit eligibility determinations – indeed, the word 'discretion' is never even used); *Bode v. St. Joseph's Health Systems*, 298 F. Supp. 2d at 921 ("the delegation of discretionary authority must be express and unambiguous. It is not difficult to write, 'The plan administrator has discretionary authority to grant or deny benefits under this plan'").

     In contrast, the Seventh Circuit has expressly rejected the position that any particular language is necessary, *Herzberger v. Standard Insurance Co.*, 205 F.3d at 331, and instead looks to whether the plan's language indicates "that a discretionary determination is envisioned." *Diaz v. Prudential Ins. Co. of America*, 424 F.3d at 637-38. As discussed above, the language in Standard Select's plan meets this standard even though it does not include the word "discretion." Accordingly the court finds that the arbitrary and capricious standard of review is appropriate in this case.

     This undemanding standard of review leaves judgment calls to the plan's administrator, *Trombetta v. Cragin Federal Bank for Savings Employee Stock Ownership Plan*, 102 F.3d 1435, 1438 (7th Cir. 1996), which will not be disturbed if they are reasonable, *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. at 111. Specifically, a plan's decision is arbitrary and capricious only if the decisionmaker "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence . . . , or is so implausible that it could not be ascribed

to difference in view or the product of expertise." *Trombetta v. Cragin Fed. Bank Ownership Plan*, 102 F.3d at 1438, *quoting Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir. 1985); *see also Wardle v. Central States, Southeast and Southwest Areas Pension Fund*, 627 F.2d 820, 827 (7th Cir. 1980) ("we can overturn [the trustees'] determination only by finding that they abused their discretion – which is to say, that they were not just clearly incorrect but downright unreasonable").

**B.     Can the Court Consider Facts Outside the Administrative Record?**

This brings the court to the question of whether the court may still consider the finding by the Social Security Administration ("SSA") – rendered after Standard Select denied benefits – that Dr. Gutta was disabled.  As noted above, the general rule in the Seventh Circuit is that if the arbitrary and capricious standard applies, this court can only consider matters within the administrative record. *Trombetta v. Cragin Fed. Bank for Sav. Employee Stock Ownership Plan*, 102 F.3d at 1438 n.1.  This rule makes sense, as this court's task is to review the plan's decision and necessarily, review of a decision means that the court can only consider materials that were before the plan.

Dr. Gutta nevertheless contends that the fact that the SSA found that he is disabled from performing the duties of *any* occupation is probative of whether Standard Select's decision was arbitrary and capricious because the SSA's standard is far more stringent than the standard used by Standard Select.  This position is facially appealing.  *See Wilkes v. Unum Life Ins. Co. of America*, No. 01-C-182-C, 2002 WL 926279 at *9 (W.D. Wis. Jan. 29, 2002) ("Although the social security determination of disability is not binding on this court, it corroborates the conclusion that plaintiff was disabled from performing her regular occupation" because "it is

likely more difficult for a claimant to prove that she is disabled from any occupation . . . than to prove that she is disabled from her regular occupation").

So, what is the law with respect to whether the court can use a SSA determination rendered after a final decision by a plan when determining if the plan's decision was arbitrary and capricious? The decisions by the court's esteemed colleagues on this issue are, to put it mildly, rather confusing. For example, in *White v. Airline Pilots Ass'n, International*, 364 F. Supp. 2d 74, 767 (N.D. Ill. 2005), the claimant received a favorable SSA decision after the plan rendered a final decision. Because the SSA's determination was not before the plan, the court held that it could not consider the determination when reviewing the plan's decision. *Id.* In the next sentence, however, the court went on to say that "although this Court did not consider the Social Security determination for the purposes of determining whether [the plan's] decision was arbitrary and capricious, Social Security decisions are still relevant and instructive." *Id.* It is unclear how a decision can be "relevant and instructive" when it is not properly before the court.

Thankfully, the Seventh Circuit has spoken and clarified this issue. In *Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d 1040 (7th Cir. 2004), the plaintiff received a favorable SSA disability determination after he exhausted the plan's appeal process. The district court found that the plan's decision not to reopen the plaintiff's appeal for reconsideration in light of the SSA determination was reasonable because the plan provided that the last stage of administrative review was conclusive and binding. *Id.* at 1046-47 ("[w]hile Social Security decisions, if available, are instructive, these determinations are not dispositive (except in those cases where a plan ties benefits to the Social Security decision – this is not such

a case). The Pension Fund's decision not to reopen the claims process is completely proper, given the Pension Plan's concern for finality of decisions").

Here, unlike the plaintiff in *Tegtmeier*, Dr. Gutta does not appear to have asked Standard Select to reopen his administrative appeal so it could revisit its decision in light of the SSA determination. Instead, he asks this court to add a piece of evidence into the record which was not before the plan when it rendered its decision simply because that new evidence is relevant. However, just as in *Tegtmeier*, the plan in this case contains a finality clause providing that "[s]ubject to the review procedure of the Group Policy, any decision Standard makes in the exercise of our authority is conclusive and binding." Dr. Gutta has not pointed to any authority demonstrating that the court can red-line this language.

Thus, the court appreciates Dr. Gutta's desire to add a favorable piece of evidence into the record. Nevertheless, this court acts in an appellate capacity when it reviews a plan's decision denying benefits, so it cannot consider evidence which was not before the plan. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 981-82 (7th Cir. 1999) (trustees' decision must be "reviewed with respect to the information available at the time they rendered their final decision"). Similarly, the court cannot find that Standard Select acted unreasonably when it refused to reopen Dr. Gutta's case when he never asked it to do so. In any event, given the language in Standard Select's plan, it appears that any such request would have been fruitless as the Seventh Circuit has held that a plan with language similar to that used by Standard Select acted reasonably when it declined to reopen an administrative appeal to consider a subsequent SSA determination. *See Tegtmeier v. Midwest Operating Engineers Pension Trust Fund*, 390 F.3d at 1047. Thus, the court will not consider

the SSA's determination when it reviews Standard Select's decision. This brings the court to the merits, which consist of: (1) Dr. Gutta's challenge to Standard Select's benefits determination; and (2) Standard Select's counterclaim, which seeks to recover benefits paid to Dr. Gutta because Dr. Gutta received benefits under another policy which acted as an offset.

### C.    Standard Select's Benefits Determination

Dr. Gutta argues that Standard Select's reading of the plan's definition of disability was "downright unreasonable and nonsensical" and that it acted in an arbitrary and capricious manner when it denied benefits without making a reasonable inquiry into Dr. Gutta's abilities before concluding that he could work as a medical director given his specialization, age, and physical limitations.

### 1.    Definition of Disability

The plan provides that "[a]fter LTD Benefits have been paid for 24 months, you are Disabled if . . . you are either: (a) Unable to perform with reasonable continuity the material duties of any gainful occupation for which you are reasonably fitted by education, training, and experience; or (b) Unable to earn more than 80% of your Indexed Predisability Earnings while working in your own or any other occupation."

The parties' arguments focus on the words "while working" in subsection (b). Dr. Gutta contends that under subsection (b), he is disabled unless he can obtain a job that pays at least 80% of his pre-disability salary, and that he can receive benefits under this section even if he is not working. Standard Select, on the other hand, stresses that the definition of disability in sub-section (b) requires a claimant to be actually working. It also explains that subsection (b) gives an insured a financial incentive to return to work in some capacity without disqualifying him

from obtaining disability benefits and thus helps reduce the risk of malingering. Thus, if Dr. Gutta was working but not earning 80% of his pre-disability salary, subsection (b) would kick in and Standard Select would pay benefits of 80% of his pre-disability salary minus his salary (which would act as an offset).

Standard Select's plan gives it "full and exclusive authority . . . to interpret the Group Policy and resolve all questions arising in its administration, interpretation, and application." This provision does not authorize Standard Select to interpret the plan in an arbitrary manner. *See Trustees of Southern Illinois Carpenters Welfare Fund v. RFMS, Inc.*, 401 F.3d 847, 850 (7th Cir. 2005) (the plan trustees "may interpret their own plan so long as that interpretation is neither arbitrary nor capricious"). However, the plan's plain language "is [capable] of sustaining the [plan's] interpretation." *Id*. Thus, the court finds that Standard Select did not act arbitrarily and capriciously when it found that Dr. Gutta was ineligible to receive benefits under subsection (b) when he was not working when he applied for benefits. This is especially true given that the court "must give great deference to [Standard Select's] interpretation of its plan, including its interpretation of the ambiguous language in the [p]lan." *Dabertin v. HCR Manor Care, Inc.*, 373 F.3d 822, 833 (7th Cir. 2004) ("we cannot merely apply federal common law principles of contract interpretation, but rather must view the contractual ambiguity through a lens that gives broad discretion to the plan administrator to interpret the plan"). This brings the court to the central issue in this case: whether Standard Select's determination that Dr. Gutta was not disabled under subsection (a) because he was capable of being gainfully employed was arbitrary and capricious.

## 2. Is Dr. Gutta Disabled?

According to Standard Select, it reasonably and permissibly determined that Dr. Gutta is not disabled because his vision and orthopedic conditions did not prevent him from working at "any gainful occupation." Unsurprisingly, Dr. Gutta disagrees.

### a. Dr. Gutta's Vision

The parties' fact statements contain information about Dr. Gutta's vision, but Dr. Gutta's briefs only mention this issue in passing (specifically, Dr. Gutta states that Dr. Raichland opined that Dr. Gutta might eventually become blind due to macular degeneration). The court agrees with Standard Select that Dr. Raichland did not state that Dr. Gutta's vision prevented him from pursuing any suitable occupation. Instead, he said that Dr. Gutta's macular degeneration could get worse over time and eventually lead to blindness. The potential for the worsening of macular degeneration is, of course, wholly unwelcome to any patient. It does not, however, mean that Dr. Gutta's vision at the time of Dr. Raichland's evaluation prevented him from performing a job that does not require fine levels of vision.

Moreover, the only medical evidence in the record which addresses the relevant question of whether Dr. Gutta's vision prevented him from working is from Dr. Weinberg. Dr. Weinberg opined that with glasses, Dr. Gutta had 20/20 vision in both eyes and no substantial limitations on his depth perception. He also acknowledged that Dr. Gutta "does not feel capable of performing surgery due to his scotoma and decreased depth perception" so "it may be reasonable for him to stop practicing." He concluded, however, that "the objective findings on today's examination do not correlate with [Dr. Gutta's] complaints" and that Dr. Gutta "should have no restrictions on his physical abilities."

Thus, both Dr. Raichland and Dr. Weinberg agreed that Dr. Gutta might not have the level of vision necessary to perform surgery. Nevertheless, the record does not support Dr. Gutta's claim that his vision at the time he applied for disability benefits prevented him from working at any suitable occupation. The record also fails to show that Dr. Gutta's 20/20 vision and the diminution in his field of vision and ability to perceive depth prevented him from being able to work at the occupation suggested by Standard Select (Medical Director or Assistant/Associate Medical Director). Accordingly, the court finds that Standard Select's determination that Dr. Gutta was not disabled due to the issues with his vision is sensible and supported by the record and thus is neither arbitrary nor capricious.

### a. Dr. Gutta's Orthopedic Condition and Ability to Work as a Medical Director or Assistant/Associate Medical Director

As noted by Dr. Gutta, a plan administrator is "under no obligation to undergo a full-blown vocational evaluation of [the claimant's] job, but [it] was under a duty to make a reasonable inquiry into the types of skills [the claimant] possesses and whether those skills may be used at another job." *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998). Thus, where the plan administrator lacks "evidence on which to base its conclusion, it would have acted unreasonably." *O'Reilly v. Hartford Life & Accident Ins. Co.*, 272 F.3d 955, 961 (7th Cir. 2001).

Dr. Gutta contends that Standard Select acted unreasonably when it denied benefits based on its misinformed belief that he was capable of performing the occupations of a Medical Director and Assistant/Associate Medical Director. Specifically, he argues that: (1) Standard did not conduct a reasonable inquiry into the types of transferable skills he actually possessed; (2) Mr. Smith did not take into consideration the fact that he lacks basic computer skills which are

necessary for any administrative position; (3) he will not be able to obtain a position as a Medical Director and Assistant/Associate Medical Director due to his age and the overall competitive market; and (4) Standard Select failed to provide any basis for its conclusion that he could, consistent with his physical limitations, work as a Medical Director or Assistant/Associate Medical Director. The court disagrees.

With respect to transferable skills, Standard Select relied on the opinion of its vocational expert, Mr. Smith. Mr. Smith considered the occupational description of a medical director published in the Warren Surveys, which state that a medical director must have a M.D. degree and extensive knowledge of the managed care system, reimbursement methods, and treatment protocols and may report to executive officers. Dr. Gutta satisfies these requirements: he was in private practice as a general surgeon/surgical oncologist from 1980 – 2000 with surgical privileges in seven hospitals; was the Chairman of the Department of Surgery at Loretto Hospital from 1989 – 1992; the President of the Medical Staff at Loretto Hospital from July of 1993 – June of 1995; the Medical Director of Loretto Hospital from July, 1993 – 1995; the Chairman of the Department of Surgery at Oak Park/Rush Hospital from April of 2000 – December of 2001; the President Elect of Glen Oaks Hospital from January of 2001 – December of 2002; served as chairman of a quality control committee and a member of a health care committee, physician advocacy committee, and physician review committee; and attended monthly department committee meetings and quarterly medical staff meetings at different hospitals. Moreover, Dr. Gutta listed his administrative experience in his Employee's Statement submitted to Standard Select, stating that he was a chairman of the department of surgery (Honorary) and chairman of

the department quality improvement, a member of executive committees at three different hospitals, a member of cancer committees, and a member of a quality control committee.

Based on these qualifications, Mr. Smith's conclusion that Dr. Gutta "would have, based on his transferable skills and past experience and education that ability to access either the Medical Director or Assistant/Associate Medical Director positions" is not, as Dr. Gutta suggests, drawn out of thin air. Instead, Dr. Gutta's arguments show that he simply disagrees with Mr. Smith and Standard Select's conclusions. The fact remains, however, that Dr. Gutta has a M.D. degree, has run a medical practice, and has held numerous administrative positions requiring him to report to others and have knowledge of the managed care system, reimbursement methods, and treatment protocols. The fact that a different view of the record (*i.e.*, Dr. Gutta's view) is theoretically possible does not make Standard Select's decision arbitrary and capricious. *See Trombetta v. Cragin Fed. Bank Ownership Plan*, 102 F.3d at 1438 (a plan's decision is arbitrary and capricious if, among other things, it "could not be ascribed to difference in view or the product of expertise"). The court, therefore, finds that Standard Select reasonably determined that Dr. Gutta possesses the educational qualifications and administrative experience to work as a Medical Director or Assistant/Associate Medical Director.

Dr. Gutta next argues that Mr. Smith did not adequately consider the fact that Dr. Gutta lacks basic computer skills, contending that these skills are necessary for any administrative position. Standard Select found that Dr. Gutta's limited experience with computer systems would not preclude him from performing the material duties of Medical Director or Assistant/Associate Medical Director. In support, it relied on the Warren Surveys to determine what skills were material. Notably, "computer skills" (whether these are word-processing skills,

the ability to use e-mail, or other skills; Dr. Gutta does not specify exactly what skills are at issue) are nowhere on the list of material skills necessary to perform the jobs of Medical Director or Assistant/Associate Medical Director. Moreover, Dr. Gutta performed numerous administrative jobs over the years despite his lack of "computer skills." Finally, the fact that Dr. Gutta was not compensated for the vast majority of his administrative jobs is irrelevant. As noted by Standard Select, whether Dr. Gutta received compensation or not, he gained experience as he completed the tasks required by the many administrative positions he held over the years. In short, Dr. Gutta's "computer skills" argument is a non-starter.

This brings the court to Dr. Gutta's contention that he will not be able to obtain a position as a Medical Director and Assistant/Associate Medical Director due to his age and the overall competitive market. Standard Select's policy defines disability as the inability "to perform with reasonable continuity the material duties of any gainful occupation for which you are reasonably fitted by education, training, and experience." Thus, the plain language of the policy does not require Standard Select to pay disability benefits unless it can demonstrate that Dr. Gutta can find a job.

Instead, it requires the payment of benefits only if the claimant cannot perform any gainful occupation. Thus, "whether an identified alternative job existing in the national economy is actually available at a given moment in a geographic area is irrelevant." *Das v. Unum Life Ins. Co. of America*, No. CIV.A. 04-0971, 2005 WL 742444 at *11 (E.D. Pa. Mar. 31, 2005) ("As harsh as it may seem, the policy requires [the insurer] only to show that the insured is capable of performing any gainful occupation anywhere in the national economy," not that any particular position is available). This is an important distinction, as Dr. Gutta seems to be

relying on precedent in Social Security disability cases which require the ALJ to determine if a claimant can perform any other work that in fact exists in the national or regional economy. *See, e.g., Fast v. Barnhart*, 397 F.3d 468, 470 (7th Cir. 2005).

Standard Select correctly recognized that the critical question was whether Dr. Gutta could "perform with reasonable continuity the material duties of any gainful occupation for which [he was] reasonably fitted by education, training, and experience" because it noted that "[a]ctual positions available in any specific job market, how an insured presents himself or how he could be viewed by an employer is [sic] beyond the scope of our evaluation." The court cannot find that this interpretation of the policy is arbitrary and capricious because it is based on the plain language of the policy, which asks if Dr. Gutta can perform any gainful occupation, as opposed to whether he can secure a particular job. This means that Dr. Hunton's opinions regarding employers' attitudes toward "hiring persons of Dr. Gutta's age and with chronic disabilities that caused them to leave their chosen professions" are beside the point for the purposes of reviewing Standard Select's denial of benefits.

The court thus turns to Dr. Gutta's final argument: that Standard Select failed to provide any basis for its conclusion that Dr. Gutta could, consistent with his physical limitations, work as a Medical Director and Assistant/Associate Medical Director. Again, however, the court finds that Dr. Gutta disagrees with Standard Select's determination but has failed to show that the denial of benefits was arbitrary and capricious.

The record contains a description of the jobs of Medical Director and Assistant/Associate Medical Director, which are described as sedentary positions. It also contains extensive medical information which shows that Dr. Gutta cannot work as a surgeon but can perform other

sedentary jobs consistent with his skills and experience. Specifically, as noted above, the attending physician statements submitted addressing Dr. Gutta's vision all discuss whether Dr. Gutta can perform laparoscopic surgery. While there is general agreement that Dr. Gutta may eventually become blind, at the time he was evaluated, he had 20/20 vision in both eyes. Moreover, his vision problems, while incompatible with engaging in surgery, allowed him to engage in activities such as driving.

With respect to Dr. Gutta's orthopedic condition, Dr. Romeo performed surgery on Dr. Gutta's right shoulder. Post surgery, Dr. Romeo stated that the surgery had been a success and had no reservations about releasing him to play golf. Dr. Fancher reviewed Dr. Gutta's medical records and opined that Dr. Gutta would be unable to perform laparoscopic surgery while recovering from his shoulder surgery. Dr. Joshi opined that Dr. Gutta could not "perform major surgical procedures." Dr. Gandhi stated that Dr. Gutta's symptoms were pain in the left thumb, an inability to tie knots, and severe pain while wearing gloves. He also noted that Dr. Gutta had degenerative changes in the carpal bones of both wrists and could not perform surgery due to pain, the inability to wear gloves, ulnar nerve palsy, blind spots in the left eye, and impaired hand function. Dr. Gandhi thus recommended that Dr. Gutta stop performing surgery. Dr. Soruco recommended that Dr. Gutta stop working as a surgeon because blind spots and his dislocated left thumb prevent him from performing laparoscopic surgery and tying knots, respectively. Dr. Kumar performed heart surgery on Dr. Gutta, but his records do not contain any opinions as to whether Dr. Gutta's heart problems affect his ability to work.

After reviewing Dr. Gutta's medical records, Dr. Carlson found that Dr. Gutta had limitations secondary to musculoskeletal conditions (hand and wrist pain as well as degenerative

changes, bilateral ulnar neuropathies, degenerative arthritis of the knees, cervical spondylosis, and shoulder pain). He stated, "I would anticipate that a 62-year-old individual with degenerative arthritis of the wrists, left thumb, and cervical spondylosis would be capable of performing sedentary to light-level capacity work on a full-time basis. These records do not suggest there is any active or ongoing treatment to correspond to significant limitations with respect to these conditions. It would be reasonable that the claimant would be limited from repetitive upper extremity lifting, twisting and manipulating activities with respect to these conditions." Joint Apdx., Ex. D, Admin. Rec. at STND 1010.

After reviewing Dr. Gutta's medical records**,** Dr. Shih opined that, "It is my medical opinion that the medical records support the claimant's ability to work full-time in a sedentary to light-level work capacity . . . . Reasonable restrictions would be against frequent to repetitive fingering and handling activities involving the non-dominant left upper extremity. Otherwise, reasonable accommodations would include position changes every 30 to 60 minutes from sitting to standing with an ability to stand and walk on an occasional to frequent basis . . . . " *Id*. at STND 1059.

Based on this evidence, Standard Select concluded that, consistent with his physical limitations, Dr. Gutta was physically capable of performing the jobs of Medical Director and Assistant/Associate Medical Director on a full-time basis because those positions are sedentary. Dr. Gutta may disagree with the conclusion that Standard Select drew, but Standard Select's decision clearly is based upon substantial evidence because it is consistent with the medical evidence in the record. Thus, it thus easily satisfies the "arbitrary and capricious" standard of review. *See Houston v. Provident Life And Accident Ins. Co.*, 390 F.3d 990, 995 (7th Cir. 2004)

(an insurer's decision should be upheld as long as "it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome").

In the interests of completeness, the court also notes that the medical opinions which purportedly support Dr. Gutta's claim of total disability all relate to future events (*i.e.*, the fact that Dr. Gutta may eventually become blind due to his diabetes and/or macular degeneration) or contain restrictions and limitations with respect to Dr. Gutta's ability to perform laparoscopic surgery. They do not address Dr. Gutta's ability to work in a non-surgery related position associated with "any gainful occupation." Accordingly, the court finds that the denial of disability benefits was not arbitrary or capricious.

### D.  Standard Select's Counterclaim

From November 22, 2000, to December 21, 2003, Dr. Gutta received monthly disability benefits from Standard Select totaling $75,846.75. He also received monthly disability benefits totaling $129,500.00 during the same time period pursuant to a policy he had obtained through the American Medical Association (the "AMA policy"). In Standard Select's counterclaim, it contends that Dr. Gutta must return the benefits paid by Standard Select because the AMA policy is a group plan and Standard Select's plan contains an offset provision which prevents plan participants from receiving full benefits from multiple group policies. Specifically, as noted above, Standard Select's policy contains an offset for "Income Received From Other Sources," which are defined as "[t]he amount you receive or are eligible to receive because of your disability under any group insurance coverage, other than group credit insurance or group mortgage disability insurance[.]"

The parties raise a host of issues regarding Standard Select's counterclaim. Specifically, they disagree as to whether a federal common law action for reimbursement or a claim for reimbursement of money damages under § 502(a)(3) of ERISA exist. Standard Select says that both these causes of action exist and Dr. Gutta must return the benefits it paid to Dr. Gutta. Dr. Gutta unsurprisingly disagrees and also argues that Standard Select cannot establish that Dr. Gutta was unjustly enriched or that Standard paid the benefits to Dr. Gutta due to fraud, coercion, or mistake of fact.

The court will begin with the threshold issue of whether § 502(a)(3) of ERISA or the federal common law of ERISA allow Standard Select to pursue a claim for restitution in the first place. Section § 502(a)(3) provides that, "(a) A civil action may be brought . . . (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (I) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3).

The court previously denied Dr. Gutta's Rule 12(b)(6) motion to dismiss Standard Select's counterclaim, finding that it asserted a viable claim for restitution under the federal common law of ERISA but did not state a viable claim under § 502(a)(3). The Supreme Court, however, recently issued a unanimous opinion that significantly expanded the reach of § 502(a)(3). *See Sereboff v. Mid Atl. Med. Servs., Inc.*, — U.S. —, 126 S.Ct. 1869 (2006). Indeed, one of the court's colleagues recently noted that *Sereboff* confirms that Job's description of the ways of the Lord ("The Lord gave, and the Lord hath taken away") is equally applicable to the

Supreme Court.  *Mote v. Aetna Life Ins. Co.,* 435 F. Supp. 2d 827, 829 (N.D. Ill. 2006), *quoting* Job 1:21.

Prior to *Sereboff*, the Seventh Circuit recognized that money damages may be available as a component of equitable relief.  *May Department Stores Co. v. Federal Ins. Co.*, 305 F.3d 597, 602-03 (7th Cir. 2002) (money damages traditionally have been available as an element of an equitable remedy under "the equity clean-up doctrine, which allows an equitable suitor to obtain incidental damages relief in his equity suit so as to spare himself, the defendant, and the judiciary the burden of two suits on the same claim").  Nevertheless, in the ERISA context, an effort "to impose a constructive trust or equitable lien on 'particular funds or property in the defendant's possession'" is required for a breach-of-contract damages claim to be treated as restitutionary relief available to an employee benefit fund fiduciary under § 502(a)(3)." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 213 (2002).

In essence, this means that under *Great-West*, the Supreme Court required traceability (*i.e.*, the ability to identify a specific, separate amount of money) to impose an equitable lien, and did not allow a plan to go after a plan participant's general assets.  As the Supreme Court explained:

> In cases in which the plaintiff . . . could not assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him, . . . the plaintiff had a right to restitution at law through an action derived from the common-law writ of assumpsit.  In such cases, the plaintiff's claim was considered legal because he sought . . . to obtain a judgment imposing a merely personal liability upon the defendant to pay a sum of money . . . . In contrast, a plaintiff could seek restitution in equity, ordinarily in the form of a constructive trust or an equitable lien, where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession . . . .But where . . . the property [sought to be recovered] or its proceeds have been dissipated so that no product

- 41 -

> remains, [the plaintiff's] claim is only that of a general creditor, . . . and the
> plaintiff . . . cannot enforce a constructive trust of or an equitable lien upon other
> property of the [defendant] . . . . Thus, for restitution to lie in equity, the action
> generally must seek . . . not to impose personal liability on the defendant, but to
> restore to the plaintiff particular funds or property in the defendant's possession.

*Id*. at 213-14 (internal citations and emphasis omitted).

In *Great West*, the Court applied the traceability rule to facts very similar to the facts in the instant case. The plan in *Great West* had paid medical benefits to plan beneficiaries. 504 U.S. at 207. The plan contained a provision allowing the plan to recover from the plan participants any payments paid by the plan but later recovered from third parties. *Id*. The plan tried to recover money from the participants, who had not kept the benefits separate from their other assets. *Id*. at 214.

The Court rejected the plan's request for equitable relief, explaining that "[t]he basis for [the plan's] claim is not that [the participants] hold particular funds that, in good conscience, belong to [the plan], but that [the participants] are contractually entitled to some funds for benefits that they conferred." *Id*. (emphasis omitted). Thus, the Court concluded that the plan was, in effect, trying to impose a constructive trust on particular property and that this was a legal as opposed to an equitable remedy. *See id*. When the court ruled on Dr. Gutta's motion to dismiss Standard Select's counterclaim, *Great West* was controlling. Thus, the court found that because Dr. Gutta comingled the benefits paid by Standard in with his other assets, the traceability rule explicated in *Great West* doomed Standard Select's § 502(a)(3) claim.

However, in the Court's recent decision in *Sereboff*, it retreated from a strict traceability rule and held that a plan need not be able to trace "particular funds or property" if a claimed equitable lien by agreement is involved. 126 S.Ct. at 1875-76; *Donaldson v. Pharmacia Pension*

*Plan*, 435 F.Supp.2d 853, 866 (S.D. Ill. 2006) (Sereboff abrogated the rule in *Great West* holding that ERISA plans may only seek reimbursement only if the insured possesses clearly identifiable proceeds). In *Sereboff*, the plaintiff plan participants were injured in a car accident and their ERISA plan advanced payments for their medical expenses. 126 S.Ct. at 1872. The plan contained an "Acts of Third Parties" subrogation provision, which gave the plan fiduciary the right to recover payments made to beneficiaries by third parties for costs associated with an injury resulting from the acts of another person or party. *Id*.

The Sereboffs filed and ultimately settled a state court action against the party allegedly responsible for their injuries. *See id*. at 1892-93. They refused to reimburse the plan for the benefits it had paid. *See id*. The plan sued the Sereboffs in federal court under § 502(a)(3) of ERISA. The district and appellate courts held that the plan was entitled to reimbursement, and the Supreme Court granted certiorari to resolve the circuit split regarding the proper test for whether a claim for reimbursement under these circumstances is equitable or legal under ERISA.

The Court unanimously held that the relief sought by the plan was equitable and distinguished *Great West*, explaining that "in [*Great West*] the plan couched its claim for relief in terms of affixing personal liability on the plan beneficiary for a contractual obligation to pay money, rather than seeking to levy on an identifiable fund held by the individual against whom recovery was sought . . . [so] its requested relief amounted only to a claim for a legal remedy not otherwise provided under ERISA" *Donaldson v. Pharmacia Pension Plan*, 435 F.Supp.2d at 867, citing *Sereboff v. Mid Atl. Med. Servs., Inc.*, 126 S.Ct. at 1873-74. It then noted that the problem in *Great West* – the inability to trace monies paid by the plan – was not present in the

Sereboff's case because they had maintained the monies from their plan in a separate account. 126 S.Ct. at 1874.

Critically, however, the *Sereboff* court went on to note that the Sereboffs had to reimburse the plan for an entirely separate reason above and beyond the fact that the money from their plan was traceable because they had segregated it from the rest of their assets. Specifically, the Court found that the "Acts of Third Parties" provision of the plan triggered the "familiar rul[e] of equity that a contract to convey a specific object even before it is acquired will make the contractor a trustee as soon as he gets a title to the thing." 126 S.Ct. at 1875. In other words, the Court held that the plan's language preventing double-dipping when a plan participant received money from a third party created an equitable lien by agreement. *See id.*

At the instant the Sereboffs received money from the third party, the money they had already received from their plan was the subject of an equitable lien and thus was traceable even though the money from the plan was not segregated. *See id.* (the "Acts of Third Parties" provision of the plan created a lien on the portion of the settlement from the Sereboffs' state-court litigation that was owed to the plan, and the plan could seek reimbursement of the money subject to that equitable lien). In sum, the *Sereboff* Court held that the plan's action seeking reimbursement was equitable in nature because it was, in effect, an action to enforce an equitable lien established by agreement. *See id.*

The court will revisit the viability of Standard Select's request for relief under § 502(a)(3) in light of this precedent. As noted above, Standard Select's plan contains an offset for "Income Received From Other Sources," which is defined as "[t]he amount you receive or are eligible to receive because of your disability under any group insurance coverage, other than

group credit insurance or group mortgage disability insurance[.]" Under *Sereboff*, this clause creates an equitable lien on any monies paid by Standard Select prior to Dr. Gutta's receipt of benefits from another group plan.

Thus, Standard Select may seek reimbursement of the benefits paid to Dr. Gutta if the plan created an equitable lien covering these benefits because the plan contains an offset provision preventing plan participants from receiving money from multiple group plans and provides that the participant must immediately reimburse Standard Select for any overpayments. Policy at 13. This brings the court to Dr. Gutta's numerous fall-back positions with respect to Standard Select's counterclaim. According to Dr. Gutta, even if Standard Select's claim is viable, he can retain benefits paid by Standard Select because: (1) Standard Select knew about the AMA plan and voluntarily chose to pay benefits; (2) Dr. Gutta would not be unjustly enriched by retaining Standard Select's payment; (3) Standard Select did not promptly investigate whether the AMA policy was an offsettable group plan, and (4) the AMA policy is franchise insurance, not a group plan, so it does not count as an offset.

The first three arguments are meritless. The record does not show that Standard Select knew that the AMA plan was group insurance and voluntarily chose to pay benefits, and if Dr. Gutta has benefits to which he is not entitled, he would be unjustly enriched. Moreover, Dr. Gutta's attempt to fault Standard Select for bringing a counterclaim in this action is not well taken as Standard Select's request for reimbursement raises difficult legal issues and Dr. Gutta to this day refuses to concede that the AMA policy is group insurance.

This brings the court to Dr. Gutta's only colorable argument: that the AMA policy is franchise insurance and thus is outside the ambit of Standard Select's offset provision. Franchise

insurance exists when the insured contracts directly with the insurer and receives an individual insurance policy, while group insurance is characterized by a single policy issued to an organization so that organization's members can receive coverage. *Couch on Insurance*, 1 §2:29 (3rd ed. 2006) ("Group insurance is an arrangement by which a single insurance policy is issued to a central entity – commonly an employer, association, or union – for coverage of the individual members of the group. Franchise insurance is a variation on group insurance, in which all members of the group receive individual policies"). For group insurance, "[i]ndividual group members typically receive certificates proving they are insured and listing what coverage is provided." *Id*. at §7:1.

The record shows that Dr. Gutta received a "Certificate of Insurance" from Sentry Life. *See* Joint Ex. B. This certificate states that Dr. Gutta's coverage was obtained under "Group Policy No. 90-10613-47," which was issued to the AMA as the group policyholder. Dr. Gutta's Certificate of Insurance also states that it is "subject to all the provisions, definition, limitations and conditions" of Group Policy No. 90-10613-47. Thus, the Sentry Life policy certainly looks like a group policy.

The Seventh Circuit, however, has noted that matters are not necessarily this straightforward because a plan is not "group insurance" merely because it is issued to a group. *Hall v. Life Ins. Co. of North America*, 317 F.3d 773, 775 (7th Cir. 2003). Instead, "[f]ranchise insurance is a variation on group insurance, in which all members of the group receive individual policies." *Id*. at 776. In this case, however, the court is reminded of the saying "if it looks like a duck and quacks like a duck it is a duck."

The Sentry Life policy says it's a group policy insuring members of the AMA and contains a conversion provision which provides that under certain circumstances, the policy can be converted to " a guaranteed renewable individual disability policy." Joint Ex. B at Part V. The court fails to see how the policy can be franchise insurance (*i.e.*, an individual policy issued to Dr. Gutta due to his membership in a group) when it states that it is issued to the AMA and envisions the possibility that under certain circumstances, the policy as to insured group members could be converted into an individual policy. If it was indeed an individual policy, it would be pointless to contain a provision allowing a group member to convert the policy to an individual policy. Accordingly, the court finds that the AMA policy is group insurance. This means that it falls within the offset provision in the Standard Select policy and that Standard Select is entitled to summary judgment in its favor as to its counterclaim.

**III      Conclusion**

As discussed above, Standard Select's motion to strike materials outside the administrative record [#103] is granted. In addition, Standard Select's denial of benefits was not arbitrary and capricious and Standard Select is entitled to summary judgment as to its counterclaim. Thus, Dr. Gutta's motion for summary judgment [#109] is denied and Standard Select's motion [#98] is granted. The clerk is direct to enter a Rule 58 judgment and to terminate this case from the court's docket.


DATE:    September 14, 2006

Blanche M. Manning
United States District Court Judge